UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 04-CR 10305-WGY |
| KEVIN APONTE, Defendant | ) ) ) ) | |

## Kevin Aponte's Motion For Pretrial Release

Now comes the Defendant, Kevin Aponte, by and through counsel, pursuant to 18 U.S.C. §3142, and hereby moves the Court to release the defendant pending trial in the above-captioned matter to an in-patient drug rehabilitation program (such as the Gosnold facility) or, in the alternative, to the custody of his mother with stringent conditions of release. The defendant relies on the memorandum of law incorporated herein.

### REQUEST FOR ORAL ARGUMENT

The defendant respectfully requests oral argument on the within motion.

### LOCAL RULE 7.1 CERTIFICATION

Attorney Robert M. Goldstein has conferred with government counsel and has attempted to resolve or narrow the issues raised herein.

**Memorandum of Law**

**I.     *Introduction***

On August 6, 2004, the Court convened a detention hearing and preliminary examination with respect to the defendant, after which the Court requested Pretrial Services to evaluate the possibility of a drug rehabilitation treatment program for the defendant. Alternatively, the Court advised that, if the defendant was not eligible for a treatment program, it would take the matter of pretrial release under advisement. (Docket Notes, attached hereto as Exhibit 1). Pretrial services, by and through U.S. Pretrial Services Officer Basil Cronin, has advised the defendant that he would be eligible for participation in a drug rehabilitation program.[1] The defendant argues herein that the Court should either release the defendant to an in-patient drug rehabilitation program, such as the program administered by the Gosnold facility, or, in the alternative, release him with certain stringent conditions of release that will reasonably assure the safety of the community and ameliorate any hypothetical risk of flight. One of suggested conditions of release herein, should the Court not release the defendant to the Gosnold facility, is for the defendant to be released to the custody of his mother, Rosa I. Aponte, who has agreed to act as a third party custodian for her son and to have him reside with her at 79E Hill Street, Brockton, Massachusetts. (*See* affidavit of Rosa Aponte, attached hereto as Exhibit 2). Ms. Aponte is a homemaker and mother who raised eleven (11) children, she does not work, and will therefore be able to provide virtually constant

---

[1]. Defense counsel has spoken with U.S. Pretrial Services Officer Basil Cronin, who advised that the defendant would be eligible for placement in a drug rehabilitation program, though his statements regarding eligibility should not be construed as a recommendation for placement therein. The defendant would request a supplemental report from Pretrial Services based upon the information and recommendations contained herein.

2

supervision of her son. (*See* Exhibit 2). Critically, Mr. Aponte would not be returning to the residence or the lifestyle that form the basis of the accusations in this case.

**II.**     *Relevant Law*

Under the Bail Reform Act of 1984 ("Act" and/or "Bail Reform Act", herein), the government's burden of persuasion varies depending on the prong of the statute at issue. Specifically, with regard to risk of flight as a basis for pretrial detention, it is the obligation of the government to prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's appearance in the future. *See, e.g., U.S. v. Shea*, 749 F.Supp. 1162, 1166 (D.Mass. 1990). The government must prove by clear and convincing evidence, however, that no condition or combination of conditions will reasonably assure the safety of any person or the community. *Id*.

**III.**    *Argument*

   **A.**   *Application of case law to the facts before this Court clearly supports a finding in favor of pretrial release to either a drug-rehabilitation program or to Mr. Aponte's mother's custody.*

When the government moves to detain based upon the issue of dangerousness, the Court must conduct a bifocal inquiry. *U.S. v. Tortora*, 922 F.2d 880, 884 (1st Cir.1990). First, the Court must determine whether Mr. Aponte is properly classified as "dangerous". To assist this inquiry, Congress delineated several factors to be considered: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug; (2) the weight of the evidence as to guilt or innocence; (3) the history and characteristics of the accused, including the persons' character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to

3

drug or alcohol abuse, criminal history and record concerning appearance at court proceedings, whether defendant was on probation, parole or other release when he allegedly committed subject offense; and (4) the nature and seriousness of the danger posed by the person's release. *Tortora*, 922 F.2d at 884; *Shea*, 749 F.Supp. at 1164; 18 U.S.C. §3142(g). After due consideration of these factors, if the Court finds that the defendant is "dangerous", the Court must then determine whether any combination of conditions will reasonably assure the safety of the community. *Tortora*, 922 F.2d at 884.

Before examining the facts and circumstances of this case against prior decisional law, it is critical to note that the First Circuit has clearly mandated that courts cannot require the defendant to guarantee the safety of the community. *Tortora*, 922 F.2d at 884. "Requiring that release conditions *guarantee* the community's safety", the First Circuit cautioned in *Tortora*, "would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention." *Tortora*, 922 F.2d at 884 (emphasis in original), *citing* S.Rep. No. 225, 98th Cong., 2d Sess. 4-12, 1984 U.S. Code Cong. & Admin. News at 3189. Rather, "courts cannot demand more than an 'objectively reasonable assurance of community safety'." *Tortora*, 922 F.2d at 884, *quoting U.S. v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985); *see also Shea*, 749 F. Supp. at 1167 (stating that "Congress did not declare that the community is entitled to assurances of freedom from all harm", and noting that a court cannot detain arrestees on the mere apprehension of danger of harm, court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of safety) (emphasis in original).

Moreover, and of equal import, the Bail Reform Act of 1984 was created to detain *only a small but identifiable group of persons*—it unequivocally "did not signal [] a

4

Congressional intent to incarcerate wholesale the category of accused persons awaiting trial." *U.S. v. Barnett*, 986 F.Supp 385, 391 (W.D.La 1997). "Rather, Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions, no matter how stringent." *Barnett*, 986 F.Supp at 391. The Barnett Court found support for these conclusions in the pertinent Senate Report:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the powers to deny release pending trial. The decision to provide for pretrial detention is in no way a derogation of the importance of the defendant's interest in remaining at liberty prior to trial. . . . It is anticipated that [pretrial release] will continue to be appropriate for the majority of Federal defendants."

*Barnett*, 986 F.Supp at 391, *quoting* S.Rep. No. 225, 98th Cong., 1st Sess. 6-7, reprinted in 1984 U.S. Code Cong. & Admin. News at 3189-90 (footnotes omitted). The Act sets forth a number of potential conditions of release to be considered, and the "wide range of restrictions available ensures, as Congress intended, that *very few defendants* will be subject to pretrial detention." *Barnett*, 986 F.Supp at 391, *quoting Orta*, 760 F.2d at 891 (8th Cir.1985) (emphasis added).

  A serious examination of pertinent case law compels the inexorable conclusion that Congress truly envisioned the detainment of major drug traffickers with organizational networks possessing sophisticated infrastructures, individuals who possess "both the resources and foreign contacts to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences", *U.S. v. Dillon*, 938 F.2d 1412, 1416 (1st Cir.1991); Senate Report No. 98-225, 98th Congress, 2d Session at 20, reprinted in U.S. Code Cong. & Ad. News at 3203, and "who are often in

5

the business of importing and distributing dangerous drugs, and thus, because of the nature of the criminal activity with which they are charged, [] pose a significant risk of pretrial recidivism", *U.S. v. Shea*, 749 F.Supp. 1162, 1165-1166 (D.Mass.1990). Or, alternatively, Congress envisioned the Act's application to individuals such as Carmen Tortora, an individual with a "nasty habit of committing crimes while on parole", an individual who had sworn to kill informants, and an individual who "agreed to kill his brother and desert his mother on her death bed if in the Mafia's best interests." *Tortora*, 922 F.2d at 885-886.

Mr. Aponte is not accused of being an individual who has sworn allegiance to some criminal organization, such as the Mafia, nor does he stand accused of operating or directing some major drug trafficking organization. At the present moment, he stands accused of being a felon in possession of a firearm with an obliterated serial number.[2] Likewise, Mr. Aponte is not alleged to be a leader of any criminal organization, an issue that seems to have been dispositive in several leading "pretrial detention" cases in the First Circuit, *see U.S. v. Patriarca*, 948 F.2d 789 (1st Cir.1991) (in ordering defendant's pretrial release on special conditions court characterized defendant as never being "a strong leader" of the Mafia and as "one who achieved his position by virtue of nepotism rather than merit"); *Shea*, 749 F.Supp. 1162 (D.Mass. 1990) (discussing Shea's leadership role in affirming his pretrial detention and noting other two defendants' lack of leadership role in ordering their pretrial release); *U.S. v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990) (noting that "leaders or individuals with the ability to direct the criminal activity of others pose a special threat to the safety of the community), as well as the

---

[2]. The defendant has been advised that the government is still considering filing additional drug-related charges, but as of today's date no additional charges have been levied.

Second Circuit, *U.S. v. Colombo*, 777 F.2d 96, 99-100 (2d Cir. 1985) (court emphasizing defendant's leadership role and the danger that he might direct and supervise criminal activity if released on bail); *U.S. v. Gotti*, 219 F.Supp.2d 296, 300 (E.D.N.Y. 2002) (characterizes Second Circuit authority "as being the pragmatic equivalent of a *per se* rule that where the government establishes that a defendant is the leader or acting leader of an organized crime family [] the defendant must be detained").

Of significant comparative value to the instant matter is *U.S. v. Shea*. In that matter, in ordering the release of defendants Mackie and Hogan, the Honorable Robert E. Keeton focused on his lack of a leadership role within their criminal organization:

> [I]n contrast to defendant Shea, whom the government witness testified was described as a 'cocaine wholesaler' and 'in charge' of the drug trafficking organization, defendant Mackie was described . . . as a 'day to day manager for Shea'. . . Like the second defendant released in [*U.S. v.*] *DiGiacomo* (Antonio Spagnolo), defendant Mackie might 'have the capacity to obtain criminal assistance from associates', but likely 'does not have the authority to direct other members' of the instant drug trafficking organization.

*Shea*, 749 F.Supp. at 1171 (internal citations omitted). "Given defendant Mackie's subsidiary role in defendant Shea's organization", Judge Keeton continued, "the risk of harm to any other person or the community from defendant Mackie is less difficult to control with appropriate conditions of house arrest". *Shea*, 749 F.Supp. at 1171. Judge Keeton ordered defendant Mackie's release despite the following facts: (1) Mackie was indicted and charged with a total of 40 counts, including operation of a continuing criminal enterprise, conspiracy to distribute cocaine, 32 counts of cocaine distribution, using a telephone to facilitate a drug trafficking crime, and use or possession of a firearm in relation to a drug trafficking crime, (2) after listening to two tape recorded conversations that indicated Mackie was "a person prone to violence", and (3) several

7

firearms, cocaine, a scale and other drug paraphernalia were found in Mackie's home. *Shea*, 749 F.Supp at 1170-71. "Although the firearms, cocaine and drug-related paraphernalia found at defendant Mackie's premises . . . weigh against defendant Mackie's release", Judge Keeton stated, "suitable conditions of his release may be ordered that would sharply reduce the danger posed by his history of access to firearms, drugs and drug paraphernalia." *Shea*, 749 F.Supp. at 1171-72.

With respect to defendant Hogan, who was charged with conspiracy to distribute cocaine and use of a telephone to facilitate a drug trafficking crime, Judge Keeton ordered him released as well, with full knowledge of his criminal record, evidence that Hogan was an "enforcer" in the criminal organization, tape recorded conversations in which Hogan threatened violence, and evidence of an alleged threat to a detective in the case. *Shea*, 749 F.Supp. at 1172. Judge Keeton noted that Hogan did not appear to have the authority to direct the actions of members of the organization and that his criminal record, while including convictions for violent crimes such as assault and battery with a dangerous weapon and assault and battery with intent to kill, did not "establish an *uncontrollable* propensity to engage in illegal activity despite stringent conditions of release." *Shea*, 749 F.Supp. at 1172 (emphasis added).

Clearly, if pretrial detention of Mackie and Hogan was not necessary, then certainly there exist suitable conditions to ensure the safety of the community with regard to Mr. Aponte. Mackie was charged with 40 criminal counts, including the operation of a continuing criminal enterprise engaged in the trafficking of cocaine, and using or possessing firearm in relation to a drug trafficking crime. *Shea*, 749 F.Supp. at 1164. Mr. Aponte is charged with being a felon in possession of a firearm. Both Mackie and Hogan

8

were released despite evidence of tape-recorded conversations indicating they were persons prone to violence, and Hogan was released despite an alleged threat to a law enforcement officer that he had "quite a nice house" on the Cape. *Shea*, 749 F.Supp. at 1170-1173. There is no evidence in this case of any threats or threatening actions taken by Mr. Aponte and his fiancée, a licensed real estate professional, has submitted a letter in support of Mr. Aponte's release, wherein she characterizes him as a kind-hearted and caring individual. (Letter attached hereto as Exhibit 3). Hogan, the third defendant in the *Shea* case, had a criminal record that extended over almost thirty years, he had been convicted of violent crimes, such as assault and battery with intent to kill, and he made threatening statements captured on tape by the government. While Mr. Aponte has a criminal record that includes so-called "crimes of violence", the decisional law discussed above clearly demonstrates that such convictions do not, *ipso facto*, compel detention. If Mr. Aponte has anything in common with Mackie or Hogan, it is the fact that he, like them, is not alleged to be the leader of any criminal organization and he does not possess the ability or desire to direct the actions of any so-called associates. *See Shea*, 749 F.Supp. at 1171 (in releasing Mackie, court noted that he was merely a "day to day manager" for the leader of his criminal organization, and compared Mackie to the second defendant released in *United States v. DiGiacomo*, 746 F.Supp. 1176 (D.Mass.1990), a person who might "have the capacity to obtain criminal assistance from 'associates'," but likely "does not have the authority to direct other members" of the drug trafficking organization). *Shea*, 749 F.Supp. at 1171. Stated simply, there is no rational basis to conclude that a person such as Mr. Aponte possesses an *uncontrollable* propensity to engage in illegal activity despite stringent conditions of release, especially when one

9

considers that suitable conditions existed to release individuals such as Mackie and Hogan.

With regard to any hypothetical risk of flight, *U.S. v. O'Brien*, 895 F.2d 810 (1st Cir.1990) and *U.S. v. Patriarca*, 948 F.2d 789 (1st Cir.1991) are two additional cases which support pretrial release in the case at bar. In *U.S. v. O'Brien*, the First Circuit Court of Appeals affirmed the district court's and magistrate judge's decision to release the defendant, a former D.E.A. agent indicted for trafficking in cocaine, on the conditions that he wear an electronic monitoring bracelet, he post a home as security, he report daily by telephone to the pretrial services office, and he submit to random unannounced visits to his home by pretrial services officers. *O'Brien*, 895 F.2d. at 810-811. *O'Brien*, which is principally referred to as a "risk of flight" case, is noteworthy because he was released with conditions despite the fact that he was a "high-ranking federal drug agent for 18 years," and notwithstanding his "understanding of the inner workings of law enforcement, his proximity to an international airport, the fact that he had international connections from having worked in France for five years, and his present emotional and financial problems". *O'Brien*, 895 F.2d at 811.

In *Patriarca*, the First Circuit affirmed the district court's order allowing the pretrial release of Raymond J. Patriarca, the alleged former boss of a Mafia family, despite the fact that he was charged with two RICO violations and five Travel Act violations, and despite the fact that Patriarca "presided at a Mafia induction ceremony at which the inductees swore lifelong loyalty to the Mafia, and promised to kill any informants if instructed to do so." *Patriarca*, 948 F.2d at 792. In fact, the court affirmed Patriarca's release despite evidence offered by the government that the Patriarca Family

(and the defendant himself) had "once assisted a fugitive's flight by supplying him with $100,000 cash". *Patriarc*a, 948 F.2d at 793.

There is no evidence in this case that Mr. Aponte possesses the financial resources and/or international contacts necessary to support a fugitive lifestyle. Mr. Aponte was born and raised in the Brockton community and his family still resides in this area. Indeed, the fact remains that Mr. Aponte was released on bail in the predicate state criminal action before the federal government decided to accept this case for prosecution, yet he remained within the jurisdiction and complied with the conditions of his release. Mr. Aponte has now hired private counsel to represent him in the instant case, which also reflects his desire to confront the charges against him and see this matter to its conclusion.

    **B**.    ***Mr. Aponte's personal history and the facts and circumstances of this case support pretrial release in this case.***

A serious examination of the factors pertinent to the issue of "danger to the community" delineated by Congress within §3142(g) illuminates the simple proposition that Mr. Aponte does not fit within the congressional paradigm of a person who poses an *uncontrollable* danger to the community. Even assuming arguendo Mr. Aponte committed the charged crime, and casting aside for the moment the presumption of innocence that forms the backbone of our criminal justice system, Mr. Aponte's life history portrays a young man who to date has made the wrong decisions regarding the direction of his life, but it does not portray some hardened leader of a criminal organization. Mr. Aponte is 26 years old, he was born and raised in Brockton, Massachusetts in a family with ten brothers and sisters and is a lifelong resident of that community. The defendant's mother, Rosa, sill resides in Brockton and has assumed

11

responsibility for the caretaking of two of her grandchildren. Virtually all of Mr. Aponte's brothers and sisters still reside in the Brockton area and remain supportive of their brother. Mr. Aponte's mother has agreed to serve as a third-party custodian in this case, to allow Mr. Aponte to reside in her home, and to allow Pretrial Services to take any and all steps necessary to facilitate his release. (Exhibit 2). Obviously, Mr. Aponte has strong ties to the community and his family. His fiancée has submitted a letter in support of his release, attesting to his kind-hearted demeanor. (Exhibit 3).

      Mr. Aponte will ultimately pay the price for the decisions that led him to this point if convicted of the charged crime, but that simply does not compel pretrial detention that will seriously impede his ability to assist with his defense, as well as his ability to receive treatment for the drug and alcohol issues that have undoubtedly contributed to his past and present legal problems. Mr. Aponte suffers from marijuana and alcohol issues and has requested placement in a rehabilitation program. Defense counsel has conversed with U.S. Pretrial Services Officer Judith Oxford, who advised that the Gosnold facility does indeed treat a large majority of persons who suffer from marijuana and alcohol problems. As such, the defendant has requested placement within that facility (or a similar facility). Should it be determined that the defendant is not so eligible, however, he seeks release to his mother's custody with certain conditions, which obviously would include some type of out-patient drug and alcohol rehabilitation program. The defendant has a criminal history, but there are zero defaults on his record. Indeed, the state district court released the defendant on the underlying charge in this case on $15,000.00 bail and the defendant did not flee the jurisdiction at that point.

With regard to the weight of the evidence against the defendant, the government's case in this matter rests entirely upon the legality *vel non* of a search warrant issued from the state district court. *See Palmer-Contreras*, 835 F.2d at 18 (proper to consider validity of search in assessing strength of evidence against defendant when validity of search has been raised by defendant in the district court).[3] As such, the defendant respectfully contends that for purposes of pretrial release or detention, it can not be stated that the weight of the evidence in this case militates strongly in favor of detention. Nonetheless, even if one assumes *arguendo* that the defendant's substantive motions are denied, that the search and seizure are upheld, and the defendant is convicted of the charged offenses, Mr. Aponte simply does not face the certainty of the type of severe sentence that would motivate one to attempt to endanger anybody in the community or to flee the jurisdiction. In contradistinction to somebody like the defendant Mackie discussed *supra*, who was granted pretrial release in the face of charges of running a continuing criminal enterprise and 32 counts of cocaine distribution, Mr. Aponte has been charged with being a felon in possession of a firearm with an obliterated serial number. Pursuant to the §2K2.1 of the Federal Sentencing Guidelines, the charged offense has a base offense level of 24 if the defendant has two felony convictions for either a crime of violence or a controlled substance offense, or 20 if the defendant has only one prior felony conviction of either a crime of violence or a controlled substance offense. The Guidelines call for an increase of

---

[3]. In *Palmer-Contreras*, the defendants argued on appeal that the case against them was not strong because the search conducted in that case was invalid. The First Circuit ruled that "[b]ecause the matter was not challenged" by the defendants in the district court, the government therefore "had no reason, in the context of the detention hearing, for further developing the factual predicate for the search." *Palmer-Contreras*, 835 F.2d at 18. As such, the First Circuit ruled that, as the matter then stood, it would be speculative whether the defendants would be able to mount a successful motion to suppress and that, at that moment, it had no reason to disagree with the district court's conclusion that the evidence against the defendants was strong. *Id.*. The import of *Palmer-Contreras* to this case, then, is that the First Circuit clearly intimated that the district courts can, when a defendant contests the validity of a search in the district court, properly consider that issue in determining the strength of the evidence against the defendant.

13

two (2) levels because the firearm in question is alleged to have obliterated serial numbers (*see* U.S.S.G. §2K2.1(b)(4)). As such, the defendant's adjusted offense level under the Guidelines would be either 26 or 22, with a decrease of three (3) points for acceptance of responsibility, and therefore a total offense level of either 23 or 19. The defendant is either a criminal history III or IV and so his corresponding guideline ranges would be 57-71/70-87 (total offense level of 23) or 37-46/46-57 (total offense level of 19). Of course, all of the foregoing is premised upon the vitality of the Guidelines themselves, which have been stricken by the large majority of the courts to address the issue post-*Blakely* and which the Supreme Court will decide in the upcoming days or weeks. In any event, the point of import is that there simply is not the certainty of a severe sentence that militates in favor of a finding that no combination of conditions could ensure the safety of the community or the defendant's appearance in court as required. Simply put, Mr. Aponte does not pose an *uncontrollable* risk of pretrial recidivism.

In enacting the Bail Reform Act, "Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions, no matter how stringent." *Barnett*, 986 F.Supp at 391. The enactment of the Act "did not signal [] a Congressional intent to incarcerate wholesale the category of accused persons awaiting trial." *Barnett*, 986 F.Supp. at 391. There simply is no suggestion in this case that Mr. Aponte is part of "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons." *Barnett*, 986 F.Supp at 391, *quoting* S.Rep. No. 225, 98th Cong., 1st Sess. 6-7,

14

reprinted in 1984 U.S. Code Cong. & Admin. News at 3189-90 (footnotes omitted). The defendant respectfully suggests that the conditions proposed in Section C below will more than reasonably assure the safety of the community and the appearance of the defendant as required, should the defendant not be accepted into the Gosnold facility (or another similar facility).

      **C.**     *<u>Proposed conditions to reasonably assure the safety of the community</u>*.

      1.     Mr. Aponte will reside with his mother, Rosa Aponte, at 29E Hill Street in Brockton, Massachusetts. Mr. Aponte agrees to remain in the custody of his mother, who has agreed to act as a third party custodian and to report any violation of a release condition to the Court.

      2.     Mr. Aponte will remain in his mother's home 24 hours a day subject to electronic monitoring, except that he may leave his home for medical emergencies or appointments with his attorney (but only after advising pretrial services of the times of such appointments).

      3.     Mr. Aponte will meet and/or communicate directly or indirectly only with his attorney and individuals approved by the Court. If requested, Mr. Aponte will keep a record of his direct and indirect communications.

      4.     Mr. Aponte and his mother will execute an agreement such that the failure to appear in Court as required will result in the forfeiture of a bond in an amount deemed appropriate by the Court.

      5.     Mr. Aponte will report daily to Pretrial Services.

      6.     Mr. Aponte and his mother will consent to visits from Pretrial Services.

      7.    Any other condition the Court deems necessary to reasonably assure the safety of the community, including but not limited to out-patient drug rehabilitation should the defendant not be accepted to an in-patient facility.

      Critically, the conditions proposed herein do not rely on the defendant's good faith compliance, a factor which supported release in *Patriarca* and militated against release in *Tortora*, because items such as the third-party custodianship and the electronic monitoring provide independent, objective means of ensuring compliance with the Court's orders. Moreover, the suggested conditions do not require "Herculean efforts" on the part of the government. This issue of "heroic measures" was discussed in *Tortora*, wherein the First Circuit noted that "[g]iven the breadth of human imagination, it will always be possible to envision some set of release conditions which might reasonably assure the safety of the community." *Tortora*, 922 F.2d at 887. The Court went on to cite several conditions that impliedly constituted the unnecessary "heroic measures", such as posting government agents to watch Tortora at all times, to follow him to all appointments, "and otherwise act as private jailers." *Tortora*, 922 F.2d at 887. Mr. Aponte does not suggest any such "heroic measures", but rather suggests any set of conditions that will not unduly burden the government and that will not require "private jailers."

**IV.**    *Conclusion*

      For the above-enumerated reasons, Mr. Aponte requests that the Court issue an order that he be released to an in-patient drug rehabilitation program, such as the Gosnold facility, or to the custody of his mother with appropriate conditions.

                                          Respectfully Submitted,
                                          Kevin Aponte,
                                          By His Attorney,

                                          _____
                                        Robert M. Goldstein
                                        Mass. Bar No. 630584
                                        114 State Street
                                        Boston, Massachusetts  02109
                                        (617) 742-9015

Dated: November 10, 2004


## CERTIFICATE OF SERVICE

     I, Robert M. Goldstein, hereby certify that a true copy of the above document was served upon Assistant United States Attorney William Connolly, via electronic filing and hand-delivery, on November 10, 2004.

                                          _____
                                        Robert M. Goldstein